UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RONALD PUMPKIN SEED,<br><br>Defendant. | 5:17-CR-50017-JLV<br><br>REPORT AND RECOMMENDATION |
| --- | --- |

Pending is Defendant's Motion to Suppress (Doc. 48).  A hearing was held on May 8, 2018.  Defendant was personally present and represented by his attorney of record, Nate Nelson.  The Government was represented by the Assistant United States Attorney Megan Poppen.  Three witnesses testified at the hearing.  Eight exhibits were received into evidence.  Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## **JURISDICTION**

Defendant is charged in an Indictment with five counts of Aggravated Sexual Abuse of a Minor, in violation of 18 U.S.C. §§ 1153, 2241(c), and

2246(2)(A), (B), and (D).  The pending Motion was referred to the Magistrate

Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's

Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

In September 2015, minor child L.E. II was forensically interviewed at

Child's Voice in Sioux Falls, South Dakota, where she reported sexual abuse by

Defendant Ronald Pumpkin Seed.  On December 19, 2016, FBI Special Agent

("SA") Brett Garland spoke with Defendant Ronald Pumpkin Seed in Pine Ridge,

South Dakota.  SA Garland knocked on Mr. Pumpkin Seed's mother's door at

approximately 2:00 p.m., introduced himself, and asked to speak to

Mr. Pumpkin Seed, explaining that he needed Mr. Pumpkin Seed's help with an

investigation.  (Ex. 1 at 0:00–7:00).  Mr. Pumpkin Seed's mother let SA Garland

into the house and retrieved Mr. Pumpkin Seed, who agreed to accompany SA

Garland to his vehicle and talk.  (Id.).  SA Garland spoke in a calm and friendly

manner to both the mother and to Mr. Pumpkin Seed himself.  (Id.).

Once in the vehicle, SA Garland introduced himself a second time,

showed Mr. Pumpkin Seed his credentials, and stated the interview was being

recorded.  (Id. at 7:00-7:30).  SA Garland again told Mr. Pumpkin Seed that he

would like his help with an investigation, and stated that if Mr. Pumpkin Seed

was willing to talk to him he could feel free to do so, but he was under no

obligation to do so, and he did not have to answer any questions that he did

not want to answer. (Id. at 8:45–9:00).  SA Garland also informed Mr. Pumpkin

Seed that the car doors were unlocked and that Mr. Pumpkin Seed could get

up and leave whenever he wanted to. (Id. at 9:00–9:06). Mr. Pumpkin Seed informed SA Garland that he suffered from short-term memory loss resulting from a head injury. (Id.).

SA Garland began the interview by asking general questions about Mr. Pumpkin Seed's background. (Id. at 9:30–13:00). Mr. Pumpkin Seed demonstrated a strong command of important dates and events, and gave quick, coherent, and responsive answers to SA Garland's questions. Mr. Pumpkin Seed also explained in great detail the custody case surrounding L.E. II to SA Garland. (Id. at 10:30–16:30). SA Garland began asking general questions about L.E. II, and Mr. Pumpkin Seed provided similarly detailed, responsive answers. (Id. at 18:00–25:00). SA Garland testified that the FBI later recovered a smartphone from the residence, which contained an email address belonging to "ronaldpumpkinseed1@gmail.com," as well as various games downloaded from the Internet. (FTR at 9:54 a.m.).[1] SA Garland testified that someone using that phone would have to understand how to access and download items from the Internet. (FTR at 9:55 a.m.).

Approximately fifteen minutes into the interview, SA Garland told Mr. Pumpkin Seed that he needed to "clear up some information" and he needed Mr. Pumpkin Seed's help. (Ex. 1 at 25:30). SA Garland asked Mr. Pumpkin Seed about past sexual encounters with L.E.II. Mr. Pumpkin Seed initially denied any sexual contact with L.E. II. However, SA Garland

---

[1] No transcript was prepared. Rather, the evidentiary hearing was recorded via For The Record ("FTR"), Rapid City Courtroom 2, May 9, 2018.

stated that he already knew the answers to some of the questions he was asking, and he just wanted proper clarification.  (Id. at 27:00).  Mr. Pumpkin Seed continued denying that any sexual contact occurred, and claimed he had memory loss; SA Garland repeated several more times that he needed Mr. Pumpkin Seed to be truthful, and he knew for a fact that the sexual acts occurred.  (Id. at 29:00–38:00).  Throughout the discussion, SA Garland maintained a cordial, calm tone, and did not raise his voice or articulate any threats or promises.  As the interview continued, Mr. Pumpkin Seed told SA Garland that various sexual encounters occurred between himself and L.E. II as a way of teaching or helping L.E. II understand her body.  (Id. at 39:00– 57:00).  Approximately 50 minutes into the interview, Mr. Pumpkin Seed indicated he wanted to stop talking, and SA Garland ceased asking questions. (Id. at 58:00).  SA Garland thanked Mr. Pumpkin Seed and provided his contact information.  Mr. Pumpkin Seed exited the vehicle voluntarily.  (Id. at 1:03:00–1:04:00).   At the evidentiary hearing, SA Garland testified he had no information at the time of the interview that Mr. Pumpkin Seed was uneducated or suffered from low intelligence.  (FTR at 9:51 a.m.)

On January 27, 2017, a federal grand jury returned an indictment charging Mr. Pumpkin Seed with five counts of Aggravated Sexual Abuse of a Minor.  A court-ordered competency evaluation determined that Mr. Pumpkin Seed's full-scale IQ is within the first percentile, and that he suffers from a mild intellectual disability.  (Ex. 3 at p. 27, 30).

## DISCUSSION

**I.    Whether Mr. Pumpkin Seed Voluntarily Confessed**

Mr. Pumpkin Seed argues that his statements to SA Garland were given involuntarily and must be suppressed.  Mr. Pumpkin Seed maintains that his mental impairment should have been easily recognizable to a seasoned law enforcement officer like SA Garland, and therefore a "lesser quantum of coercion" renders his confession involuntary.  (Id.).  In support of his argument that his will was overborne, Mr. Pumpkin Seed claims SA Garland used deceptive tactics by telling Mr. Pumpkin Seed he already knew the answers to the questions and "just wanted [his] help clarifying things."  (Doc. 49 at p. 5). Through testimony presented at the evidentiary hearing, Mr. Pumpkin Seed further argues that the interview was inherently coercive because SA Garland was in a position of authority, informed Mr. Pumpkin Seed he was an FBI agent, and conducted the interview in his law enforcement vehicle.  (For The Record ("FTR"), May 9, 2018, RC Courtroom 2, at 10:28 a.m.).

"Due process requires that confessions be voluntary."  United States v. Anaya, 715 F. Supp. 2d 916, 931 (D.S.D. 2010) (citing Brown v. Mississippi, 297 U.S. 278, 285–86 (1936)).  "The appropriate test for determining the voluntariness of a confession is 'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)).  A statement is voluntary if it is "the product of an essentially free and unconstrained choice by

its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). "On the other hand, a statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724. The government bears the burden of showing by a preponderance of the evidence that the challenged statements were voluntary. United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004).

When assessing whether the defendant's will was overborne, the court considers "the conduct of the officers and the characteristics of the accused." LeBrun, 363 F.3d at 724. Relevant factors include the defendant's prior experience with law enforcement; the nature of the interrogation, including its duration and location; whether the defendant was in custody or otherwise restrained; whether law enforcement employed hostile tactics; and defendant's intelligence and mental state. See, e.g., id. at 726; United States v. Turner, 157 F.3d 552, 555–56 (8th Cir. 1998).

Low intelligence or impaired mental functioning are not determinative of voluntariness without some evidence of coercive police activity. Colorado v. Connelly, 479 U.S. 157, 165 (1986) ("A statement rendered by [a mentally incompetent individual] might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum . . . and not by the Due Process Clause[.]"); Turner, 157 F.3d at 555 (finding confession voluntary where defendant "was clearly intelligent to understand his rights" even though he was intoxicated with PCP at time of confession and his IQ was in "low-

6

average to borderline range").  Neither does the use of suggestive or deceptive questioning tactics render a confession involuntary unless "the overall impact of the interrogation caused the defendant's will to be overborne."  United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)); United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995) (finding confession voluntary although defendant had eighth-grade education and below-average intelligence; officers' "suggestive" questions did not rise to requisite level of coercive activity because no threats or promises were made).

Mr. Pumpkin Seed presented testimony from expert witness Dr. Stephen Manlove, a licensed psychiatrist.  (FTR at 10:15 a.m.).  Dr. Manlove testified that SA Garland used a variety of techniques and tactics which, when applied to a person with Mr. Pumpkin Seed's level of cognitive impairment, could lead to a false confession.  Dr. Manlove concluded that Mr. Pumpkin Seed was susceptible to having his will overborne.  However, Dr. Manlove's opinion is not dispositive of this issue, and must be weighed among other factors.

There is no dispute in this case that Mr. Pumpkin Seed is cognitively impaired.  His court-ordered competency evaluation placed his full scale IQ within the first percentile, and found that he has a mild intellectual disability.  (Ex. 3 at p. 27, 30).  However, there is no evidence of police misconduct sufficient to overbear Mr. Pumpkin Seed's will.  See Makes Room For Them, 49 F.3d at 415.  SA Garland did not display his weapon, raise his voice, or behave in an intimidating manner.  His tone throughout the interview was cordial and

7

respectful.  Moreover, although the interview took place in SA Garland's vehicle, SA Garland informed Mr. Pumpkin Seed that he was free to go at any time, did not lock the car doors, and did not restrain Mr. Pumpkin Seed; significantly, Mr. Pumpkin Seed did in fact terminate the interview and exit the vehicle on his own initiative after less than an hour of questioning.

Mr. Pumpkin Seed argues that SA Garland employed deceptive questioning techniques; however, no threats or promises were made.  See id.; Brave Heart, 397 F.3d at 1041.  Furthermore, there is no evidence to suggest SA Garland knew about his cognitive impairment or exploited that impairment. SA Garland testified that at the time of the interview, he had no information regarding Mr. Pumpkin Seed's intelligence level.  (FTR at 9:50 a.m.).  While Mr. Pumpkin Seed volunteered information about his head injury, he also appeared intelligent enough to understand his rights, and gave quick, responsive, detailed answers to SA Garland's questions about his background and family history.  See Turner, 157 F.3d at 555; Makes Room For Them, 49 F.3d at 414.  Because there is no evidence of coercive police activity, the government has met its burden to show that Mr. Pumpkin Seed's confession was voluntarily given.

## CONCLUSION

It is respectfully recommended that Mr. Pumpkin Seed's motion to suppress be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 21st day of June, 2018.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge