UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>vs.<br><br>RONALD PUMPKIN SEED,<br><br>              Defendant. | CR. 17-50017-JLV<br><br>ORDER |

**INTRODUCTION**

Defendant filed a motion to suppress a statement he gave to law enforcement. (Docket 48). The motion was referred to Magistrate Judge Daneta Wollmann for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the standing order dated March 9, 2015. The magistrate judge conducted a hearing on the motion and issued a report and recommendation ("R&R") concluding defendant's motion should be denied. (Docket 59). Defendant timely filed objections to the R&R. (Docket 62). For the reasons stated below, defendant's objections are overruled and the report and recommendation is adopted in full.

**DEFENDANT'S OBJECTIONS**

Mr. Pumpkin Seed's objections to the R&R are summarized as follows:

1. Defendant's cognitive impairment should have put FBI Special Agent ("SA") Garland on notice before the interview proceeded.

2. SA Garland should have employed standard practices for interviewing an intellectually disabled person.

3. The magistrate judge improperly discounted the testimony of Dr. Stephen Manlove.

4. SA Garland's interview tactics were coercive and deceptive.

5. Mr. Pumpkin Seed gave an involuntary statement which should be suppressed.

(Docket 62).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. See also Fed. R. Crim. P. 59(b)(3). The court completed a *de novo* review of those portions of the R&R to which objections were filed.

## ANALYSIS

A grand jury indicted Mr. Pumpkin Seed on five counts of aggravated sexual abuse of a minor, L.E. II ("L.E."), in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(A), (B) & (D). (Docket 1). Mr. Pumpkin Seed filed a motion to suppress the statement he made to SA Brett Garland on December 19, 2016. (Docket 48). Mr. Pumpkin Seed asserts the statement was involuntary and should be suppressed. Id.

The magistrate judge held a suppression hearing at which SA Garland, Dr. Manlove and Mr. Pumpkin Seed testified and several exhibits were admitted. (Dockets 57 & 58). Relying on the audio recording of the hearing,

2

For The Record ("FTR"), the magistrate judge issued the R&R. (Docket 59 at p. 3 n.1). The district court ordered the preparation of a transcript of the suppression hearing, which was filed under seal after the R&R and defendant's objections were filed. See Docket 64. The court will cite to the transcript and not to the FTR referenced by the magistrate judge. The court carefully reviewed the CD of the interview of Mr. Pumpkin Seed.

1. DEFENDANT'S COGNITIVE IMPAIRMENT SHOULD HAVE PUT SA GARLAND ON NOTICE BEFORE THE INTERVIEW PROCEEDED

By a court-ordered competency evaluation, the magistrate judge found Mr. Pumpkin Seed had a "full-scale IQ . . . within the first percentile, and that he suffered from a mild intellectual disability."[1] (Docket 59 at p. 4) (referencing Docket 16 at pp. 27 & 30; also filed at the hearing as Exhibit 3). The magistrate judge concluded that "[l]ow intelligence or impaired mental functioning are not determinative of voluntariness without some evidence of coercive police activity." Id. at p. 6 (referencing Colorado v. Connelly, 479 U.S. 157, 165 (1986); United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998)). "Neither does the use of suggestive or deceptive questioning tactics render a confession involuntary unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" Id. at p. 7 (citing United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)) and referencing United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995)).

---

[1] Mr. Pumpkin Seed has a full-scale IQ of 64. (Docket 16 at p. 14). "[A]n average IQ is 100." (Docket 64 at p. 56:9).

3

The magistrate judge found "[t]here is no dispute in this case that Mr. Pumpkin Seed is cognitively impaired. . . . However, there is no evidence of police misconduct sufficient to overbear Mr. Pumpkin Seed's will." Id.

Mr. Pumpkin Seed objects to this conclusion because upon becoming aware of defendant's impairment, SA Garland should have been put on notice of defendant's mental status. (Docket 62 at p. 2). Defendant contends that with this notice SA Garland should have known he was dealing with "a meek and mentally challenged individual." Id. at p. 3.

SA Garland's recorded interview with Mr. Pumpkin Seed lasted approximately 58 minutes. The court listened to the recording several times to verify defendant's statements made during the interview. It is apparent from the first several minutes of the interview that Mr. Pumpkin Seed was mildly intellectually disabled.

During the initial portion of the interview, Mr. Pumpkin Seed gave prompt, accurate details including his name, address, date of birth, telephone numbers (both a land line and cell phone), who lived in the house with him and the date and circumstances surrounding his brother's death in 2015. During this portion of the discussion, SA Garland asked for clarification of numbers, dates and other information. In each instance, Mr. Pumpkin Seed gave prompt and clear answers.

Mr. Pumpkin Seed suggests SA Garland was less than candid about his knowledge of defendant's intellectual disability. (Docket 62 at p. 2). SA Garland testified that "especially at the beginning of the interview [when] we were talking in general, [his memory] was very good. He could cite specific

4

dates of when the moved into the residence, when his brother passed away, when [L.E.] . . . was born, specific instances of interactions with advocates or lawyers regarding child custody, things of that nature."  (Docket 64 at p. 17:6-130).  SA Garland did not see anything which would indicate Mr. Pumpkin Seed had a physical impairment.  Id. at p. 18:6-9.  SA Garland acknowledged on cross-examination he was aware Mr. Pumpkin Seed had suffered a head injury "based on what he [Mr. Pumpkin Seed] said."  Id. at p. 27:17-18.  SA Garland testified he was not concerned about Mr. Pumpkin Seed's head injury affecting his ability to admit to his actions.  Id. at p. 27:19-21.

The court finds SA Garland was put on notice early in the interview process of Mr. Pumpkin Seed's mild intellectual disability.  The magistrate judge acknowledged that disability and factored that disability into the analysis of whether the statement given by Mr. Pumpkin Seed was voluntary. Defendant's objection is overruled.

2.     SA GARLAND SHOULD HAVE EMPLOYED STANDARD PRACTICES FOR INTERVIEWING AN INTELLECTUALLY DISABLED PERSON

Mr. Pumpkin Seed objects to the magistrate judge's ultimate conclusion that defendant's statement was voluntary because he asserts SA Garland "needed to adhere to standard practices for interrogating mentally challenged individuals."  (Docket 62 at p. 3) (referencing 42 U.S.C. § 12101(b)(1)).  He argues "[t]he Americans with Disabilities Act requires public entities, including law enforcement agencies, to 'reasonably modify' their interrogation practices to help safeguard mentally disabled persons from being discriminated against."

5

Id. at p. 3 n.1. Mr. Pumpkin Seed contends "[t]he ADA is extremely broad in application and in the past has been applied to interrogation practices of law enforcement agencies." Id. (referencing Calloway v. Boro of Glassboro Department of Police, 89 F. Supp. 2d 543 (D.N.J. 2000); Seremeth v. Board of County Commissioners of Frederick County, 673 F.3d 333, 335 (4th Cir. 2012)).

Section 12101 of the ADA declares that "[i]t is the purpose of this chapter . . . to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . ." 41 U.S.C. § 12101(b)(1). Mr. Pumpkin Seed's citations are too fact specific to provide authority applicable to the facts of this case.

The Seremeth court suggested law enforcement should have used a qualified interpreter for a deaf individual or handcuffed him in front of his body so he could write notes to the officers, but in the fact specific situation of a domestic violence investigation, those accommodations were not reasonable. Seremeth, 673 F.3d at 340. In Calloway, plaintiff, a deaf individual, appeared at the police station and was frustrated because an allegedly unqualified interpreter could not communicate with her. Calloway, 89 F. Supp. 2d at 548. In a subsequent civil rights case, the district court found that conducting an interrogation at a police station is an activity covered by the ADA. Id. at 554. The court ultimately concluded no claim existed because "Calloway does not articulate any actual harm that she experienced as a result of her allegedly strained communication with [the unqualified interpreter]." Id. at 562.

Mr. Pumpkin Seed does not offer specific guidance as to how SA Garland's interview with the defendant should have been modified. Without clarification, the court is not willing to simply discount the interview process employed by SA Garland and conclude that in some non-specific manner the interview violated the ADA. Defendant's second objection is overruled.

3. THE MAGISTRATE JUDGE IMPROPERLY DISCOUNTED THE TESTIMONY OF DR. STEPHEN MANLOVE

Dr. Stephen Manlove, a board-certified psychiatrist, testified at the suppression hearing. (64 at pp. 37-80). The magistrate judge acknowledged that "Dr. Manlove testified that SA Garland used a variety of techniques and tactics which, when applied to a person with Mr. Pumpkin Seed's level of cognitive impairment, could lead to a false confession." (Docket 59 at p. 7). The magistrate judge considered Dr. Manlove's opinion but concluded his "opinion is not dispositive of [whether the statement was voluntary], and must be weighed among other factors." Id.

Mr. Pumpkin Seed acknowledged the magistrate's declaration was "a legally correct statement" but that "it calls into question whether the Magistrate used the correct weight in considering the testimony given." (Docket 62 at p. 4). Defendant contends "Dr. Manlove[] testified to the fact that Mr. Pumpkinseed [sic] was extremely susceptible to having his will overborne given his impairment. . . . [and] that the use of the techniques employed by SA Garland on an individual with the impairment of Mr.

7

Pumpkinseed [sic], could easily lead to an involuntary false confession." Id. (reference generally to the suppression hearing testimony).

Dr. Manlove's testimony focused on whether Mr. Pumpkin Seed was a person who was susceptible to making a false confession. (Docket 64 at pp. 39-54). The magistrate judge clarified the purpose of the suppression hearing was not to determine whether Mr. Pumpkin Seed may have given a false confession.

> It's irrelevant for purposes of today's hearing whether or not Mr. Pumpkin Seed gave a false confession. I am not the trier of fact and so for my purposes whether or not it's a false confession is a question for the jury. While there is some information here that's been presented that may bear on whether or not [the statement is] voluntary, those are two different legal concepts.

Id. at p. 54:11-17. The magistrate judge refocused defense counsel's inquiry with the following explanation for the purpose of the hearing.

> So the information that I am looking for is, one, which is largely undisputed, that Mr. Pumpkin Seed is lower functioning, low functioning. But low intelligence or impairment in and of itself is not a reason for determining that a statement is not voluntary. There has to be some police misconduct. I understand there's evidence of the tactics that were used and as I understand the issues, that will have to be what I decide is whether or not those tactics, the questioning is stopped, the false dichotomies, isolation, interrupting, if those tactics are what the Eighth Circuit would consider to be coercion, but the issue of whether it's a false confession, at least as I understand it, unless the parties want to make a different record, is not relevant.

Id. at pp. 54:18-55:6. Defense counsel acknowledged the magistrate judge properly framed the purpose of the hearing and the issue to be resolved during

8

the hearing. Id. at p. 55:7-13. A recess was taken so defense counsel could discuss the magistrate judge's clarification with Dr. Manlove. Id. at p. 55:13-15.

When the hearing reconvened, Dr. Manlove was asked if Mr. Pumpkin Seed was coerced into admitting criminal wrongdoing. Id. at p. 56:21-24. Dr. Manlove responded:

> I think that when [Mr. Pumpkin Seed was] interviewed he thought he had a choice. I think that when the authoritative figure [SA Garland] told him . . . he knew [Mr. Pumpkin Seed] was guilty, that changed that picture; it made [Mr. Pumpkin Seed] feel that he had to admit it again to make him feel that he had to acquiesce to that scenario in some manner and may have overborne his choice, his ability to make a free choice.

Id. at pp. 56:25-57:6. Dr. Manlove opined he believed Mr. Pumpkin Seed was deceived by SA Garland's line of questioning and that deceit led to the possibility of Mr. Pumpkin Seed "being coerced or his will being overborne." Id. at p. 57:7-13.

Dr. Manlove returned to his original theory that Mr. Pumpkin Seed gave a false confession.

> We know that interrogative techniques were used which, I think, could be considered coercive because we know that they have created false confessions as a lead for other people in the past. We know that there was deception. Whether Mr. Garland knew he was deceiving him or not, I don't know. I am not making a moral judgment about Mr. Garland, but the system that he comes out of must be telling him that or somehow is training him to be telling him that if there's somebody in child advocacy in one of these child advocacy interviews says that somebody committed a crime, that means that they did, but that's not true. . . . So stating it as truth makes that deceptive whether Mr. Garland intended it to be deceptive or not. So there's coercive interviews, some deception

9

> used to kind of tell [Mr. Pumpkin Seed] that there was no other answer that he was guilty. . . . And finally, we know that the same coercive strategies create false confessions.

Id. at p. 57:20-58:14.

The court's review of the interview by SA Garland discloses that Mr. Pumpkin Seed was a willing participant in the conversation. He volunteered background information on his family structure, who lived where and who visited his home and similar facts when asked to provide that information by SA Garland. Whether he subsequently gave a false confession is a separate jury question from whether the statement was voluntary. "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . ." Jackson v. Denno, 378 U.S. 368, 376 (1964) (referencing Rogers v. Richmond, 365 U.S. 534, 544 (1961) ("[F]or purposes of the Federal Constitution, on the question whether the behavior of the . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth."). "[R]ules of evidence, not the Constitution, exist to ferret out false or untrustworthy evidence." United States v. Anaya, 715 F. Supp. 2d 916, 951 (D.S.D. 2010).

The court finds the magistrate judge considered Dr. Manlove's testimony, but he focused on whether Mr. Pumpkin Seed gave a false statement, not

> used to kind of tell [Mr. Pumpkin Seed] that there was no other answer that he was guilty. . . . And finally, we know that the same coercive strategies create false confessions.

Id. at p. 57:20-58:14.

The court's review of the interview by SA Garland discloses that Mr. Pumpkin Seed was a willing participant in the conversation. He volunteered background information on his family structure, who lived where and who visited his home and similar facts when asked to provide that information by SA Garland. Whether he subsequently gave a false confession is a separate jury question from whether the statement was voluntary. "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . ." Jackson v. Denno, 378 U.S. 368, 376 (1964) (referencing Rogers v. Richmond, 365 U.S. 534, 544 (1961) ("[F]or purposes of the Federal Constitution, on the question whether the behavior of the . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth."). "[R]ules of evidence, not the Constitution, exist to ferret out false or untrustworthy evidence." United States v. Anaya, 715 F. Supp. 2d 916, 951 (D.S.D. 2010).

The court finds the magistrate judge considered Dr. Manlove's testimony, but he focused on whether Mr. Pumpkin Seed gave a false statement, not

whether the statement was voluntary under the applicable standard.

Defendant's third objection is overruled.

4.      SA GARLAND'S INTERVIEW TACTICS WERE COERCIVE AND DECEPTIVE

Mr. Pumpkin Seed claims SA Garland's tactics "confused" defendant and that defendant could help himself out by giving the right answer. (Docket 62 at p. 3). Defendant contends the agent's inappropriate tactics included the following interview statements by SA Garland:

> I already know the answers to this and just need clarification;
>
> I know she touched your penis;
>
> I know for a fact that there were instances where she touched your penis;
>
> [I]f you don't tell me the truth, I think bad thoughts;
>
> [I]t makes me think you have something to hide;
>
> [T]he questions I am asking you Ronald I already know the answers to;
>
> I know she put her mouth on your penis;
>
> I can articulate to my boss that Ronald was completely truthful with me; and
>
> [I]t is often times worse when people don't tell me the truth . . . I already know the answers.

Id. at p. 3 n.2 & 3 (general references to the audio recording). Defendant submits "[t]hese types of leading questions set up [Mr. Pumpkin Seed] to give an involuntary confession." Id. at p. 3.

The magistrate judge addressed this argument.

11

> Mr. Pumpkin Seed argues that SA Garland employed deceptive questioning techniques; however, no threats or promises were made . . . . Furthermore, there is no evidence to suggest SA Garland knew about his cognitive impairment or exploited that impairment. SA Garland testified that at the time of the interview, he had no information regarding Mr. Pumpkin Seed's intelligence level. . . . While Mr. Pumpkin Seed volunteered information about his head injury, he also appeared intelligent enough to understand his rights, and gave quick, responsive, detailed answers to SA Garland's questions about his background and family history.

(Docket 59 at p. 8) (internal citations to the audio recording omitted; referencing Brave Heart, 397 F.3d at 1041; Turner, 157 F.3d at 555; Makes Room For Them, 49 F.3d at 414).

As stated above, the question before the court is not whether Mr. Pumpkin Seed may have given a false confession, but whether his statement was voluntary. "The sole concern of the Fifth Amendment . . . is governmental coercion." Connelly, 479 U.S. at 170. "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.' . . . [T]he voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Id. (citing Oregon v. Elstad, 470 U.S. 298, 305 (1985); other references omitted).

"The mere fact that an officer may have elicited a confession through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, does not render a confession involuntary unless the overall

impact of the interrogation caused the defendant's will to be overborne." United States v. Boslau, 632 F.3d 422, 428-29 (8th Cir. 2011) (internal quotation marks omitted) (citing Brave Heart, 397 F.3d at 1041).

The court finds the tactics used by SA Garland were not impermissible. The use of tactics suggesting the agent knew the answers to the questions or that he just wanted defendant's help to clear up some uncertainties did not rise to the level contemplated by Boslau. SA Garland "was not physically aggressive" and he "did not create any more psychological pressure than is commonly associated with interrogations." Boslau, 632 F.3d at 429.

Defendant's fourth objection to the report and recommendation is overruled.

5. MR. PUMPKIN SEED GAVE AN INVOLUNTARY STATEMENT WHICH SHOULD BE SUPPRESSED

The report and recommendation referenced the appropriate standard to be used in addressing defendant's ultimate challenge. "Due process requires that confessions be voluntary." (Docket 59 at p. 5) (citing Anaya, 715 F. Supp. 2d at 931) (citing Brown v. Mississippi, 297 U.S. 278, 285-86 (1936)). "The appropriate test for determining the voluntariness of a confession is 'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" Id. (citing United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)). "A statement is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" Id. at pp. 5-6 (citing

13

Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). "On the other hand, a statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Id. at p. 6 (citing United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004)). "The government bears the burden of showing by a preponderance of the evidence that the challenged statements were voluntary." Id. (citing LeBrun, 363 F.3d at 724). "When assessing whether the defendant's will was overborne, the court considers 'the conduct of the officers and the characteristics of the accused.'" Id. (citing LeBrun, 363 F.3d at 724). "Relevant factors include the defendant's prior experience with law enforcement; the nature of the interrogation, including its duration and location; whether the defendant was in custody or otherwise restrained; whether law enforcement employed hostile tactics; and defendant's intelligence and mental state." Id. (referencing LeBrun, 363 F.3d at 726; Turner, 157 F.3d at 555-56). "Low intelligence or impaired mental functioning are not determinative of voluntariness without some evidence of coercive police activity." Id. (referencing Connelly, 479 U.S. at 165). "Neither does the use of suggestive or deceptive questioning tactics render a confession involuntary unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" Id. at p. 7 (citing Brave Heart, 397 F.3d at 1041) (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)); referencing Makes Room For Them, 49 F.3d at 415).

14

The magistrate judge found "there is no evidence of police misconduct sufficient to overbear Mr. Pumpkin Seed's will." Id. This conclusion was based on the following findings.

> SA Garland did not display his weapon, raise his voice, or behave in an intimidating manner. His tone throughout the interview was cordial and respectful. Moreover, although the interview took place in SA Garland's vehicle, SA Garland informed Mr. Pumpkin Seed that he was free to go at any time, did not lock the car doors, and did not restrain Mr. Pumpkin Seed; significantly, Mr. Pumpkin Seed did in fact terminate the interview and exit the vehicle on his own initiative after less than an hour of questioning. . . . [N]o threats or promises were made.

Id. at pp. 7-8.

Having completed a *de novo* review of the audio recording of the interview, the court adopts the magistrate judge's findings. It is clear throughout the nearly one-hour interview Mr. Pumpkin Seed was a willing participant who understood SA Garland's questions and defendant was not forced into giving an involuntary statement. Brown, 297 U.S. at 285-86; Meirovitz, 918 F.2d at 1379; Brave Heart, 397 F.3d at 1041; Boslau, 632 F.3d at 428-29. The court finds Mr. Pumpkin Seed gave a voluntary statement to SA Garland. Id.

Defendant's fifth objection to the report and recommendation is overruled.

**ORDER**

Based on the above analysis, it is

ORDERED that defendant's objections to the report and recommendation (Docket 62) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 59) is adopted in full.

IT IS FURTHER ORDERED that defendant's motion to suppress (Docket 48) is denied.

IT IS FURTHER ORDERED that a scheduling order will be entered.

Dated December 13, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE